## Case No. 6,640.

HOLMES v. The JOSEPH C. GRIGGS.

[1 Ben. 81.][1]

District Court, E. D. New York. Nov., 1866.

SALVAGE — STEAMBOAT — COSTS — PRINCIPLES OF PUBLIC POLICY IN SALVAGE CASES.

1. A sloop laden with iron ore, went on a rock in Hell Gate, and was left by her master and crew. The sailors, however, watched her from the shore till she was carried off the rock and floated towards the Bread and Cheese, a dangerous reef, when they put out in their boat to board her. A passenger steamboat on her way to Harlem also saw her position and went to her, and took her in tow before she reached the Bread and Cheese, and before the crew reached her, and towed her to Harlem; and the master of the steamboat, while negotiations were pending to settle the claim for salvage, filed a libel to enforce the claim. Held, that the facts make out a clear case of salvage.

[Cited in The Alaska, 23 Fed. 608.]

2. The opinion of the crew of the sloop that they should have been able to save her if the steamboat had not gone to her aid, although to be taken into account in fixing the compensation, as indicating the extent of the risk, does not take the case out of the rules applicable to cases of salvage.

[Cited in M'Connochie v. Kerr, 9 Fed. 53; The Plymouth Rock, Id. 416; The Oregon,

1 [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

27 Fed. 872; The S. A. Rudolph, 39 Fed. 333.]

3. The court, if it were not a case of salvage, might be inclined to withhold from the libellant his costs, because of his putting the claim in suit, while it was in a fair way to be settled; but the same considerations of public policy which affect salvage awards are not overlooked in disposing of the question of costs.

4. On a valuation of $1,500, the court allowed $300 and costs.

[This was a libel in admiralty by John H. Holmes against the sloop Joseph C. Griggs and her cargo.] The value of the sloop and cargo was about $1,500.

Messrs. Benedict, Tracy & Benedict, for libellants.

W. J. Haskett, for claimants.

BY THE COURT. This was an action in behalf of the owners and crew of the steamboat Sylvan Grove, to recover salvage. The evidence showed that on the morning of the 15th of March, 1866, the sloop Joseph C. Griggs, laden to the extent of her capacity with iron ore on deck, in passing through Hell Gate, was driven upon Negro Head Rock. Her large anchor had been let go, in an effort to avoid the rock, but had failed to bring her to, and she grounded upon a falling tide.

Her master and crew, anticipating that the sloop might heel over as the tide fell, removed their clothes, provisions, bedding, &c., to the boat, and in it betook themselves to the shore, intending, however to watch the vessel, and attempt to save her in case she should come off under the action of the strong ebb tide. While thus abandoned for the time, a strain came upon the chain of the large anchor, which tore up the windlass and freed the vessel from the anchor, and about the same time the current swept her off the rock. She began at once to drift down the stream in the eddies which make rapidly from Negro Head Rock to the Bread and Cheese, a dangerous reef at the upper point of Blackwell's Island.

While the sloop was on the rock her position had been observed by the persons on board the Sylvan Grove, a fast passenger steamboat engaged in making hourly trips between Peck Slip and Harlem, and her movement being seen while the steamboat was landing at Astoria, the landing was hastened and an extra man taken on board, and the steamboat started to rescue her. She was reached before she struck the Bread and Cheese, was at once boarded by some of the hands of the steamboat, and, lines being got out, was towed out of danger and taken to Harlem Flats. The movement of the sloop from the rock had also been noticed by her crew, who, with the exception of her master—then absent in search of his owner—at once started out in their boat, but failed to reach the sloop until just as she began to move in tow of the steamboat. They then boarded her, and with her were taken to Harlem. The sloop sustained little or no injury while on the rock, and on being released from custody in this action, proceeded on her voyage without repairs.

These facts, which are not seriously questioned, present a clear case of salvage. The sloop, when taken hold of by the steamboat, had no one on board, and was drifting towards a dangerous shoal, where, if she had struck, the total loss of her cargo would have been almost certain, and the vessel herself seriously injured, if not destroyed. The testimony of the crew and others, greatly relied on by the claimant, to the effect that, in their opinion, the vessel would have been saved by her crew if the steamboat had not gone to her aid, although to be taken into account in fixing the amount of compensation as indicating the extent of the risk, does not take the case out of the rules applicable to cases of salvage. "A situation of actual apprehension, though not of actual danger, makes a case for salvage compensation." The Raikes, 1 Hagg. Adm. 247; The New Holland, Vice Adm. at Gibraltar. "Salvors," says Judge Story, "are not to be driven out of court upon the suggestion that, if they had not touched a derelict ship, the latter might in some possible way have been saved from all calamity, and therefore the salvors have little or no merit." The Henry Ewbank [Case No. 6,376].

The case being then, in my opinion, one for a salvage award, it remains to fix the amount. In determining this, I bear in mind that the whole doctrine of salvage rests upon considerations of public policy. I also take into consideration, on the one side, that the service in question was rendered promptly; that it was performed by a steam vessel; that the steam vessel was a passenger boat, at the time engaged in making a regular trip; that the place was one beset with dangers for sailing vessels, where steamboats of this class can often render powerful and much needed aid. On the other side, I notice that the steamboat was not detained so as to interfere with her next trip; that the service involved little labor or skill and no risk; that the crew of the sloop was near at hand, with a chance of being able, without assistance, to get their vessel into the true tide, and so to tow her by their boat to the adjacent shore.

How considerations like these have affected the determinations of courts of admiralty in awarding salvage, the cases, unnecessary to be cited here, will show. As somewhat analogous to the present case. I may, however, refer to the case of The Margaret, Shipp. Gaz. 1857, where a brig had touched on the spit of the Dutchman's Bank, but shortly afterward came off with loss of anchor, and then let go another and hoisted a signal, and where the court in awarding £250 to a tug which went to her aid, held that "not only the present, but the prospective state of danger of the vessel res-

cued was to be considered." I also refer to the case of The Ocean Witch, a schooner of 136 tons, which was towed off the sands in the Thames, where the court awarded £100, "in order to encourage steamers to assist vessels when ashore in the Thames." Shipp. Gaz. Feb. 1853. After duly weighing the considerations which the present case seems to present, my conclusion is that $300 is the proper sum to be awarded to these salvors, and I shall also give them their costs, although in view of the evidence tending to show that either undue haste or a misapprehension on the part of the master of the steamboat caused the claim to be put in suit while it was in a fair way to be settled without expense, I might, were it not a case of salvage, be inclined to withhold them. But I find, on looking into the cases, that the considerations of public policy which so largely affect every award of salvage are not overlooked in disposing of the question of costs, and that I should be departing from the rules usually applied in these cases by withholding costs. Thus, Dr. Lushington, in the case of The Rosalind, 2 Mar. L. C. 220, when he dismissed the libel on the ground that no salvage service had been performed, gave the libellants their costs, "in order to recognize the meritoriousness of their intentions;" and in the case of The Countess of Levin Melville, 1 Mar. L. C. 154, the same learned judge, when pronouncing in favor of a tender made without costs, declared the salvors to be entitled to full costs. So, too, in the case of The Innocenza, when a libel for salvage was dismissed without costs against the salvors. he cites, with approval, .the words of Lord Stowell, that, "if, as a general rule. he accompanied a decree (adverse to salvors) with costs, it would discourage other salvors, a class of people not very able to comprehend these matters, and therefore would be likely to injure public interests." See, also, Coote, Prob. Pr. p. 63. A decree must accordingly be entered in favor of the salvors for the sum of $300 and their costs to be taxed.