McConnochie and others *v.* Kerr and another.

*(District Court, S. D. New York.* August 26, 1881.)

1. Admiralty—Jurisdiction—Co-Salvors.

Courts of admiralty have jurisdiction of an action to compel distribution by one co-salvor, who has obtained the entire salvage compensation, among the other co-salvors entitled.

2. Salvage and Towage Services.

The steam-ship Colon, bound from Aspinwall to New York, became disabled in her machinery in the Bahamas. She had a full set of sails, but was "at the mercy of the winds," and a hurricane, which was not unusual in those waters, "would have put the ship in jeopardy." Being nearly becalmed, she employed the Pomona, bound for Jamaica, to tow her to the nearest anchorage, 57 miles distant, for repairs.

*Held,* that the service rendered was in the nature of salvage, and not a "mere towage service." *Semble* it is not within the proper discretion of a master to deviate from his voyage to render a mere towage service for the simple convenience of another vessel in expediting her passage, unattended by any circumstances of danger; and if such circumstances exist the service is salvage, for which officers and crew are entitled to share in the compensation.

3. Salvage—Arbitration—Award—Binding on Parties Only.

The owner and captain of the Pomona having filed a libel against the Colon, claiming salvage "in behalf of all entitled," the respective owners, after answer and before hearing, submitted to arbitration the question whether the service was salvage, and the amount of compensation. The arbitrator decided that the service was not salvage, and awarded $3,000 to the owner of the Pomona as for a towage service, which amount was paid to him, and the suit discontinued. Thereupon the present libel was filed by three of the crew to compel distribution of that money among the co-salvors.

*Held,* that as the $3,000 was awarded on the basis of a towage service only,

and not as salvage, and received by the owner as for towage, he was entitled to retain it to his own use. The officers and crew not having been parties to the former suit, nor to the award and the settlement under it, their rights and remedies against the Colon are in no way affected by it.

4. ESTOPPEL.

*Semble*, upon a libel filed " in behalf of all entitled," the libellant, so long as no others have become actual parties and no decree had, is not estopped from settling the suit for his own interest and retaining the proceeds, according to the practice in analogous suits in equity. 2 Sim. & Stu. 196, note. See *Stevens* v. *The Railroads*, 4 FED. REP. 97, and note, p. 110.

In Admiralty.

*Butler, Stillman & Hubbard,* for libellants

*Hill, Wing & Showdy,* for respondents.

BROWN, D. J. The libellants are three of the crew of the steamship Pomona, who filed this "libel and petition," in behalf of themselves and all others interested, to recover their share of $3,025.75, alleged to have been received by the respondents Kerr and Mahlman, the former as owner of the Pomona and the latter as its captain, for salvage services rendered to the steam-ship Colon on July 14, 1880. The answer admits the receipt of the money, but alleges that the service rendered to the Colon was not a salvage, but a mere towage service, in which Kerr only, as owner of the Pomona, had any legal interest.

If the money in question was paid to and received by Kerr as salvage compensation, and for the entire service, as substantially alleged in the libel, I have no doubt of the jurisdiction of this court to compel contribution to the libellants in this action. The receipt of the whole compensation as salvage would necessarily import its receipt for the benefit of all other co-salvors interested in the same service; and the determination and apportionment of the several interests of co-salvors in the gross sum received by one of them would present questions peculiarly within the cognizance of a court of admiralty. Its jurisdiction in such cases has been frequently exercised in this country during the last half century. *The Centurion,* Ware, 477; *Roff* v. *Wass,* 2 Sawy. 538; *Waterbury* v. *Myrick,* 1 B. & H. 34. Numerous other instances of this kind are cited by Judge Lowell in the careful opinion given by him in the case of *Studley* v. *Baker,* 2 Low. 205, which renders further references here unnecessary.

The questions presented for decision are, whether the service rendered to the Colon was a salvage service, and, if so, whether the libellants have any claim for contribution from the moneys received

by the respondent Kerr on account of the service rendered. The facts relating to the nature of the service are as follows:

The Pomona was an iron steam-ship of 391 tons gross tonnage, valued at about $60,000. She was upon a voyage from New York to Montego bay, Jamaica, with three passengers, a full cargo of assorted merchandise, (value not stated,) and a crew of 15 persons. The libellants are the first and third engineers and one of the seamen. At about 2 A. M. of July 14, 1880, when in the Bahamas, she noticed signals from the Colon, which was lying nearly in her course, and bore towards her. As she approached she was met by a small boat from the Colon, bearing a request from Capt. Griffen for an interview with the captain of the Pomona. Capt. Mahlman thereupon went aboard the Colon, and was informed by Capt. Griffen that the after crank-pin of the shaft of his engine had been broken; that he desired assistance in getting to an anchorage, and wished to be towed to Fortune Island, to repair his machinery. That was the nearest safe anchorage, 57 miles distant, nearly north, and directly back of the Pomona's course. Capt. Mahlman replied that his "boat was light and not calculated for towing, but that he would do the best he could." Capt. Griffen desired to agree upon a lump sum for the service, but this Capt. Mahlman declined, and it was agreed that the question of compensation should be left to the owners. A hawser was accordingly run out from the Colon and made fast to the Pomona by the crew of the latter. They got under way at about 4 A. M. and arrived at Fortune bay at about 3:15 P. M. of the same day, where the Pomona left the Colon in safe anchorage, and thence proceeded upon her voyage. The towage to Fortune bay was without difficulty, in a smooth sea, with a light, favorable wind for most of the way, and with the sails of both vessels set.

The Colon was an iron steam-ship of about 2,680 tons, one of the line of the United States Pacific Mail Steam-ship Company, plying between New York and Aspinwall. She was upon one of her regular trips from Aspinwall to New York, and was tight, staunch, and strong, and in good condition except the disabling of her machinery. Besides the breaking of the after crank-pin, the columns above the engine were broken, the forward crank-shaft bent, and the condenser and the low-pressure cylinder cracked. These damages were considerable. The low-pressure engine could not be repaired by any means at the command of the ship; but the high-pressure engine, with which she could proceed by steam, could have been repaired in about seven days, and was repaired in that time at Fortune island, when the Acapulco, of the same line, appeared and took her in tow to New York, without the use of this engine.

Capt. Griffen testified that the Colon, at the time of the accident to her machinery, was provided with a full set of sails; that she was then 31 miles S. ½ W. from Castle island light tower; that there was a slight current to the south-west; that the wind at the time was a light easterly trade, with periods of calm; and that as the wind then was he could have made, under sail, about a knot an hour. When asked if he could not have worked himself into some port, he replied: "We were at the mercy of the winds. If we had good winds

we could have gone anywhere. We could have reached anchor and sent parties for relief." He also testified that the gales incident to that region were "northers and hurricanes;" that "in a northerly gale the ship was in a good berth;" but that "a hurricane would have placed the ship in jeopardy." Before reaching Fortune island the wind had died down to perfect calm. While on their way thither two other vessels were sighted going to or from New York.

Upon these facts I must hold the service rendered to the Colon to have been not a mere towage service, but in the nature of salvage, within numerous decisions of this court in analogous cases, some of them of quite recent date. *The Steamer Leipsic*, 5 FED. REP. 108, 113; *Brooks* v. *The Adirondack*, 2 FED. REP. 387; S. C. 872; *Atlas Steam-ship Co.* v. *Steam-ship Colon*, 4 FED. REP. 469; *The Saragossa*, 1 Ben. 551; *The Emily B. Souder*, 15 Blatchf. 185. See, also, *Mayo* v. *Clark*, 1 FED. REP. 735; *Corwin* v. *The Barge Chase*, 2 FED. REP. 268; *Ehrman* v. *The Swiftsure*, 4 FED. REP. 463; *The Athenian*, 3 FED. REP. 248; *The Reward*, 1 W. Rob. 174; *The Charlotte*, 3 W. Rob. 71.

A salvage service is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger. "Mere towage service," says Dr. Lushington, (*The Reward*, 1 W. Rob. 177,) "is confined to vessels that have received no injury or damage; and mere towage reward is payable in those cases only where the vessel receiving the service is in the same condition she would ordinarily be in without having encountered any damages or accident." And in *The Princess Alice*, 3 W. Rob. 138, he says: "It is the employment of one vessel to expedite the voyage of another."

To constitute a salvage service it is "not necessary that the distress should be actual or immediate, or the danger imminent and absolute; it is sufficient if at the time the assistance is rendered the ship has encountered any damage or misfortune which might possibly expose her to destruction if the service were not rendered." *The Saragossa*, 1 Ben. 551, 553; *The Charlotte*, 3 W. Rob. 68, 71. So, if a vessel is "in a situation of actual apprehension, though not of actual danger." *The Raikes*, 1 Hagg. 247; *The Phantom*, L. R. 1 Adm. 58; *The Joseph C. Griggs*, 1 Ben. 81. And "the degree of danger," says Dr. Lushington, "is immaterial in considering the nature of the service." *The Westminster*, 1 W. Rob. 232.

But if the evidence shows that the vessel was free from all circumstances of danger, present or apprehended; that ordinary towage service, at ordinary rates, could have been shortly obtained, so that salvage compensation could not be presumed to have been intended; and that the towage was rendered for no other purpose than to expedite the completion of the voyage,—the service will be deemed to be a towage service only. *The Emily B. Souder*, 15 Blatchf. 550.

Had the Colon, in this instance, been in no apprehension of danger; had she been able, in the judgment of her master, to continue her voyage under sail without any reasonable fear of hazard beyond the ordinary perils of navigation, as in the case last cited,— no reason appears why he should not have continued on his voyage, instead of interrupting it and proceeding to Fortune island for repairs. Nor would the master of the Pomona, under these circumstances, have been justified in going back upon his course, involving a delay of nearly a day in his own voyage. That was a plain deviation, involving, presumably, a violation of the vessel's contracts with every one of its seamen, insurers, and freighters. By the maritime law the master has an implied discretionary authority to make such deviations in the interest of commerce and humanity, in order to save endangered life or property. *The Centurion*, Ware, 490; *The Hooper*, 3 Sumn. 542, 579. In the award of salvage compensation, account is taken of the increased obligations resulting from such deviations. But I have not been referred to any authority, nor do I find any, holding that it is within the lawful discretion of a master to make such a deviation from his own voyage as was made in this case, merely for the convenience of another vessel, or simply to expedite its progress, in the absence of all circumstances of danger. Ordinarily, deviations of that character would be plainly opposed to the interests of commerce, and deserve censure rather than reward. It is not to be presumed, therefore, that such a departure from the voyage of the Pomona was either asked for or assented to, except upon the ground that the Colon was in actual need of assistance, through circumstances of apprehended danger, and that some salvage compensation was expected to be paid. The Colon, at the time this assistance was rendered, was not, like the Emily B. Souder, in the same condition as to her motive power in which she was when she left her last port; nor did she seek merely to expedite her voyage, but to get to safe anchorage as speedily as possible for repairs. The nearest safe anchorage was 57 miles distant, and she was nearly

becalmed at the time the help of the Pomona was procured. There was a breeze of but one knot an hour, with periods of calm; and it was quite uncertain how soon she would be able to reach any port or safe anchorage, unassisted. If he had met no vessel to assist him, the captain says he would have sought anchorage and sent out parties for relief; that the vessel was "at the mercy of the winds," and that a hurricane, which, with "northers," were the ordinary storms of those waters, "would have put the ship in jeopardy." Through the disabling of her machinery she was, therefore, no longer prepared to encounter the ordinary contingencies of navigation in the Bahamas, either in proceeding on her voyage or in seeking a place of safety. These were circumstances of danger, though not of immediate peril, which justified the Colon in asking help of the first vessel that appeared. They justified the captain of the Pomona, under his implied authority, to deviate for purposes of salvage, in departing from her own voyage to tow the Colon to a safe anchorage, and consequently entitled the Pomona and her crew to a moderate salvage compensation.

By the accident to the Colon she had become unseaworthy for navigation in those waters. If the interests of commerce, of freighters, and of insurers all "require that no unnecessary risks be taken by a vessel's continuance at sea in a disabled and unseaworthy condition, (*Padelford* v. *Bordman*, 4 Mass. 554,) the same interests demand that encouragements be given, by rewards to captain and crew, as in cases of strict salvage, to assist all vessels so situated, whenever desired, into port or to a safe anchorage, as truly as in cases of immediate and present peril. And, whatever sums are allowed for the entire service in such a case, it is obvious that all *extra* compensation, over and above an actual indemnity to the salving vessel for the increased cost, expense, risk, and liability incurred through her deviation to render such assistance, ought in justice to be shared between the ship and her company, upon the same principles on which salvage is distributed, and not awarded to the vessel alone; and all such service should be therefore held and treated as in the nature of salvage.

The question remains whether the libellants, being entitled to share in salvage compensation, have any claim upon the respondent Kerr for the moneys paid to him on account of the service rendered. The facts in relation to the payment of the money are the following:

On the twenty-seventh of July, 1880, shortly after the arrival of the Colon in New York, the respondents filed a libel against the Colon and her cargo, "in behalf of themselves and all others entitled," claiming salvage compensation, but not stating the amount claimed. The vessel and cargo were attached, and bonds in the sum of $50,000 executed for her release. An answer was filed on September 7th by the Pacific Mail Steam-ship Company, as owner and claimant, which concluded by alleging that "the service rendered was only towage, and should not be ranked as salvage service of peculiar merit," and tendered $1,000 as "a just compensation for the services rendered." Though the libel purported to be "in behalf of all others entitled," it did not state the names or the number of the officers or crew, or make any other reference to them, or pray for any relief in their behalf. No other persons were made co-libellants, and there were no other actual parties to that suit. It does not appear that any citation was published, nor that any of the officers or crew of the Pomona, except the captain, who was one of the libellants, had any knowledge of the suit or of the subsequent proceedings.

On October 2, 1880, Mr. Kerr, the owner of the Pomona, and Mr. Houston, agent of the steam-ship company, agreed upon a submission of the claim to arbitration. The submission was oral, and the award, made on the same day, was also oral. Mr. Dennis, the arbitrator, was called as a witness in this action. From his testimony it appears that at the hearing before him Mr. Houston and Capt. Griffen were present in behalf of the Colon, and Mr. Kerr and his agent, Mr. Wessels, of the Pomona; that Capt. Mahlman was not present, nor these libellants, nor any other member of the officers or crew of the Pomona; that the questions submitted to the arbitrators were—"*First*, whether it was a salvage service; *second*, as to compensation;" that the parties present "agreed to abide by his award, whatever it might be;" that Capt. Griffen made a statement of the condition of the vessel and her general exposure, and submitted his private log; that Mr. Kerr and Mr. Wessels made a statement of what they had received from Capt. Mahlman; and "whether it was a salvage case" was pretty thoroughly discussed. He says: "I made my award in these words: that I did not regard the services as anything more than in the nature of a towing service, and that I should consider $3,000 would be a very liberal amount for compensation, and my decision was to award $3,000 in full for the service; the owner of the Colon to pay the legal expenses that had been incurred by the Pomona." He also testified:

"I did not intend, in the $3,000, to provide or include any compensation for any one other than the owner of the steam-ship Pomona. I did not consider the crew as entitled to any portion. *That question was not raised,* but it was considered in my mind. I regarded this exclusively as a towage service. *It was compensation awarded to the owner of the vessel* for the service. The gross freights usually earned by the Pomona, on a regular trip of 25 days, would be about $4,000. In awarding $3,000 I did not go on the basis of ordinary towage rates. I did not consider such services ordinary towage. I had regard to the position of the vessel, her capacity to make harbor herself, and the danger to which she might be exposed. In my judgment, compensation for the diversion of such a vessel from her regular business for such service cannot be measured by the daily earnings of her regular business."

The respective owners expressed themselves satisfied with this award, and

on October 4th the $3,000, with $25.75 for costs, were paid to the proctors of the libellants in the former action, and the following receipt therefor was given upon discontinuance of that action:

[Title of cause.] "Received from the Pacific Mail Steam-ship Company the sum of $3,025.75, the amount agreed upon in settlement of the above-entitled action; the fees of the officers of the courts to be paid by the claimants. "*New York, October* 4, 1880.            JAS. K. HILL. " WING & SHOUDY, Proctors for libellants."

From these facts it appears unmistakably, by the very terms of the award,—(1) That the claim of salvage was disallowed, and that, by consequence, all claims of the crew upon the moneys awarded were excluded, and intended to be excluded; (2) that the award of $3,000 was made to the sole use of Kerr, as owner of the vessel, and as compensation for a towage service only, and not for salvage; (3) that the allowance of $3,000 was made upon the basis of this lower grade of service as towage, and not upon the more remunerative basis of salvage; (4) it also appears that the terms and intent of the award were made known to the parties to it, that they acquiesced in it, and that the moneys in question were paid to Kerr in execution of it.

A settlement thus made is binding upon the parties to it. Neither side, as against the other, can afterwards legally or equitably assert any claims at variance with its intent or legal effect. Though the service rendered might be subsequently adjudged to be a salvage service, in proceedings by other persons interested, Kerr could claim no benefit from any share in the compensation that would have been awarded to him as owner, though it might be much larger than that received in his settlement; nor could the owners of the Colon claim any protection or indemnity from Kerr against the claims of any other persons not bound by the award and settlement. Nor can the court vary the amount of compensation awarded; but, as it was made upon the basis of a towage service only, it must be presumed to have been much less than would have been awarded to Kerr upon the basis of a salvage compensation. *The Emily B. Souder,* 15 Blatchf. 185.

As this court cannot directly set aside or vary the terms of the award and settlement, so it cannot do so indirectly at the suit of others by compelling Kerr to share with them the money which was paid to him for his own separate interest as owner, unless others have a clear legal right in the fund, and no other legal remedy exists. For if they still have other adequate remedy against the Colon for their compensation, the right of Kerr to the full benefit of the settle-

ment made by him would require them first to resort to that means of payment before coming upon the fund designed for Kerr's own benefit. I cannot perceive any ground of legal right in the libellants to share in the money paid to Kerr. No part of it was paid to their use or for their benefit. The basis of the award was a towage service merely, in which they had no legal interest. Whatever elements of salvage there were, according to the judgment of this court, in the actual service rendered, must be deemed, under the express terms of the award, to have been excluded and disregarded. The statement in the award that the sum allowed was "in full for the entire service," is controlled by the other statement that only a towage service and not a salvage service was allowed for. The sum given was awarded in full for a towage service, and that only. It was not in full for a salvage service, for that claim was disallowed. And while Kerr is bound by the finding that the service was a towage service only, other parties not bound cannot charge him, contrary to the fact, with having received the money as full salvage compensation, when it was awarded to and received by him simply as towage, and for his own exclusive use.

The libellants, moreover, have an ample remedy against the Colon. Their rights are unimpaired by the award and settlement in the former suit. They are in no degree bound thereby. The rights of co-salvors are not joint but several. The captain and owner have no authority to receive payment in behalf of other co-salvors, much less to submit their claims to arbitration or compromise. *The Britain,* 1 W. Rob. 40; *The Sarah Jane,* 2 W. Rob. 110; 2 Pars. Ship. & Adm. book 2, c. 8, § 1. But in this case the libellants were not parties to the former suit, nor to the arbitration, award, or settlement; they had no notice of the proceedings, and were not legally represented; and, considering that "the question of their right was not raised," as the arbitrator testifies, it is scarcely credible that the owners of the Colon supposed that their settlement with Mr. Kerr was not at the risk of any future claims against the Colon for salvage by the officers and crew of the Pomona.

In the adjudged cases in which contribution to the crew has been required out of moneys paid to the owner, the decisions have been based upon the ground that it appeared unmistakably that the money was in payment of the whole service as salvage, and received in behalf of all interested. In *Roff* v. *Wass,* 2 Sawy. 538, the bill rendered and paid was, "The Astoria and owners, Dr., to salvage services, $5,000."

Judge Sawyer, in affirming the decision below, says: "I am satisfied this claim covered the entire salvage services. * * * Nothing indicates any intention to limit the claim to that part of the compensation due to the owners of the vessel as separate claimants." In *Studley* v. *Baker*, 2 Low. 205, it "appeared plainly" that $1,540 of the bill paid to the owners was for salvage services; and, on payment, the owners gave a receipt for the "owners, masters, and crew." Judge Lowell says: "The compensation was such as to indicate beyond mistake that it was understood to be for salvage service, and perfectly plain that it was the interest of both parties to adjust the compensation for the whole salvage service." And in *The Centurion*, Ware, 477, the same substantial facts appeared.

In the present case it is equally plain that the opposite was intended by the award, and by the settlement and payment made in pursuance of it. Had the award been made in this case as the entire compensation for a salvage service, the libellants, upon the cases cited, would have been entitled to contribution. So, also, if a price had been originally fixed for the service, whatever its character might be, and the question submitted to the arbitrator had been merely whether it were a towage or a salvage service, and he had held it a towage service merely, upon which the whole sum stipulated had been paid to Kerr, I should have had no hesitation in adjudging contribution in such an action as this; for, in that case, the arbitrator's erroneous decision as to the legal character of the service rendered could not have had any influence in fixing the amount to be paid for the service. The owner, by his receipt of the whole stipulated price, would in that case have become possessed of the fund appropriated to its entire payment, and the libellants, not being bound by the award, could, at their option, have followed the fund as held by intendment of law in part for their benefit.

It is claimed by the libellants that, inasmuch as Kerr received this money in a suit brought by him "in behalf of all entitled" for a salvage compensation, he is estopped from denying that it was received by him as salvage, and for the benefit of all. I do not perceive how this proposition can be sustained. There is no such relation between a salving owner libellant and other co-salvors, not actual parties, as legally precludes the former from showing the terms of a settlement made by him on his own account, or from retaining the moneys intended to be paid to his own use. It could not be claimed that any such estoppel would apply to a decree of the court in such a suit

adjudging the owner's compensation alone, and not providing for the officers or crew; nor could it be claimed that the latter could in such a case demand contribution from the owner instead of proceeding upon their own libel. An award and settlement thereon of the owner's separate interest are equally effectual; and as no action or inaction of the libellants was induced by the former suit, and their remedies remain unimpaired, I do not perceive any ground for the claim of estoppel. The mere filing of a libel "in behalf of all entitled" does not increase the owner's legal authority, or of itself create any trust for other co-salvors, nor impose any additional obligations on the libellant in their behalf; it does not make others actual parties to the suit, nor prevent their filing supplementary libels of their own. If they desire, they may be allowed to come in on petition; but if they do not do so, and the court should, from any cause, have entered a decree for the separate interest of some and not of all the co-salvors, the others may still assert their separate remedies. *The Aletheia*, 13 Weekly Rep. 279. To avoid multiplicity of actions the better practice is for all co-salvors to join in one action, (*The Boston*, 1 Sumn. 328; *The Edward Howard*, Newby, 522;) and the court would doubtless withhold costs in all unnecessary proceedings. And in a libel by one co-salvor it usually, for its own convenience as well as for the convenience of others, enters a decree making provision for all. But this does not affect the several and independent legal rights of co-salvors among themselves, or their right to make separate settlements of their own interests after suit commenced, though nominally for the benefit of all others interested, so long as no others have become actual parties.

Such is the established rule in equity. In suits for the administration of assets it is not uncommon for several actions to be brought by different creditors, all for the same common object, and each for the benefit of all others interested. These may all proceed until a hearing in some one of them, when a decree will be made for the benefit of all. Until decree every such suit is entirely in the control of the actual parties to it, and may be settled at their own pleasure, without reference to others. *Ross* v. *Crary*, 1 Paige, 416; *Handford* v. *Storie*, 2 Sim. & S. 196; *Pemberton* v. *Topham*, 1 Beav. 316; *Paxton* v. *Douglas*, 8 Ves. 520; Story, Eq. Pl. §§ 98–103; *Good* v. *Blewitt*, 13 Ves. 397; 19 Ves. 336; *Hallett* v. *Hallett*, 2 Paige, 19.

In *Handford* v. *Storie*, 2 Sim. & S. 196, a claim for contribution was made upon the precise grounds urged in this case, and overruled

for the reasons above stated. And similarly in admiralty, until decree, or until other co-salvors have been brought in as actual parties, I cannot doubt that the same unrestrained liberty of separate settlement exists, though the libel is nominally in behalf of all interested, and that any such settlement, fairly made, must be upheld according to the intention of the parties to it, without any responsibility over for the moneys received in the settlement to others who were not parties to it, and were not bound by it, nor intended to be benefited by it.

The arbitrator in this case having excluded the claim to salvage, nothing remained to be compensated but the owner's individual claim for towage, and for this only the money was awarded and paid. Although the libel was filed for a larger compensation as salvage, in which others might share, the settlement was for the smaller and separate interest of the owner for towage. And it was none the less so by reason of the arbitrator's error, if it was error, as I have held, that no others had any claim to compensation for the service stated in the libel. This error, and the settlement based upon it, cannot, by presumption of law, have worked any injury to the owners of the Colon, because, upon the lower basis of compensation adopted by the arbitrator, the award to the owner is, by presumption of law, lower than his share would have been in an award of salvage compensation. If the award was, as now claimed, excessive in amount on the basis adopted, concerning which I express no opinion, that was one of the risks of the arbitration, and the court cannot correct it.

The money in question having, therefore, been paid for the owner's separate interest, and to his own exclusive use, and the amount paid having been adjusted upon that basis, I find no grounds for any legal or equitable claim upon it by the libellants, and the libel must, therefore, be dismissed, with costs.